UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

NIKKI K.,

**Plaintiff,**

    v.

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant**.

Case No. 1:20-cv-01221-TPK

OPINION AND ORDER

## OPINION AND ORDER

    Plaintiff filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security.  That final decision, issued by the Appeals Council on July 13, 2020, denied Plaintiff's application for disability insurance benefits.  Plaintiff has now moved for judgment on the pleadings (Doc. 11), and the Commissioner has filed a similar motion (Doc. 12).  For the following reasons, the Court will **GRANT** Plaintiff's motion for judgment on the pleadings, **DENY** the Commissioner's motion, and **REMAND** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

### I.  BACKGROUND

    On November 14, 2017, Plaintiff filed her application for benefits, alleging that she became disabled on September 16, 2017.  After initial administrative denials of her claim, Plaintiff appeared at an administrative hearing held on October 22, 2019.  Both Plaintiff and a vocational expert, Corrine J. Porter, testified at that hearing.

    The Administrative Law Judge issued an unfavorable decision on January 3, 2020.  In that decision, the ALJ first determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2022.  He next concluded that Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  He then found that Plaintiff suffered from severe impairments including cervical spine degenerative disc disease status post cervical discectomy and fusion, thoracic/lumbar spine degenerative disc disease, bilateral carpal tunnel syndrome status post release surgery, right shoulder rotator cuff tear/impingement syndrome/degenerative joint disease status post arthroscopic surgery and distal clavicle excision, migraines, post-traumatic stress disorder, anxiety, and depressive disorder.  He further determined that these impairments, viewed singly or in combination, were not of the severity necessary to qualify for disability under the Listing of Impairments.

    Moving on to the next step of the inquiry, the ALJ found that Plaintiff had the residual

functional capacity to perform a limited range of work at the light exertional level. However, she could only stand or walk for four hours in a workday, could handle or finger only frequently with both hands, and could reach overhead only occasionally with both arms. She could also occasionally stoop, kneel, crouch, crawl, climb stairs, ramps, ladders, ropes, and scaffolds, and be exposed to vibrations. Lastly, she required a moderate noise work environment and could understand and remember simple work instructions, make simple work-related decisions, carry out simple instructions, occasionally deal with changes in a routine work setting, and occasionally deal with coworkers and the public. After concluding that, with such limitations, she could not do her past relevant work as a home heath care attendant, the ALJ determined that Plaintiff could perform jobs like routing clerk, dispatch clerk, and marking clerk. The ALJ also determined that these jobs existed in significant numbers in the national economy. The ALJ therefore concluded that Plaintiff was not under a disability as defined in the Social Security Act.

Plaintiff, in her motion for judgment, raises two issues. She asserts, first, that the ALJ improperly relied on stale opinion evidence and his own lay opinion in formulating a physical residual functional capacity finding. Second, she argues that the mental residual functional capacity finding was not based on substantial evidence.

## II. THE KEY EVIDENCE

The Court begins its review of the evidence by summarizing the testimony given at the administrative hearing. It will then discuss the pertinent medical records.

### A. Hearing Testimony

Plaintiff, who was 39 years old on the date of the administrative hearing, testified, first, that she completed the twelfth grade and had been licensed as a home health aide. She had worked in the assisted living setting for a number of different employers. She had a cervical fusion in 2017 and went back to work for a month afterward, but had to stop working after experiencing the same symptoms (numbness in her hands) which led to her surgery. She also developed problems with her right shoulder and had daily neck pain. She had additional surgery on her shoulder and hands but her condition did not significantly improve, even with physical therapy. Additionally, Plaintiff suffered from daily headaches which were alleviated only slightly by medication. Those headaches were severe enough to interfere with her attention and concentration.

After studies showed that Plaintiff's cervical spine was still damaged, she had another neck surgery in 2019. Leading up to the surgery, she had severe pain in the right side of her neck which radiated and caused numbness in her hands. The surgery did not improve her symptoms. She was unable to lift her head or to look up, and looking down or to the right was difficult. She also had trouble washing and brushing her hair or fastening zippers or buttons. Plaintiff drove only occasionally, and only for short distances.

When asked about other impairments, Plaintiff described low back pain, depression,

anxiety, bipolar disorder, and PTSD. She had difficulty being around people and experienced panic attacks several times per week. She could not walk a block, even on a level surface, and could sit for five to fifteen minutes at most. Plaintiff said she could not lift a gallon of milk for fear of dropping it. In a typical day, Plaintiff would sleep or go to medical appointments. She also watched television. She was unable to clean her house or do laundry, and washed dishes only with difficulty.

The vocational expert, Ms. Porter, first described Plaintiff's past work as a home health aide as semi-skilled and typically performed at the medium exertional level. She was then asked questions about a person who could work at the light exertional level with various restrictions and who was limited to simple tasks with limited interaction with others. In response, she said that such a person could not do Plaintiff's past work, but she identified a number of light jobs which would be available, including routing clerk, dispatch clerk, and marking clerk. However, if the person had additional restrictions which caused her to need additional work breaks and to miss more than four days of work per month, she could not be employed. The same would be true if the person did solitary work and was off task more than ten percent of the time, or, if the person did work at which was performed a competitive pace, for five percent of the time.

### B. The Medical Records

Plaintiff's first surgery took place on January 12, 2017. The surgeon performed an anterior cervical discectomy at C5-6 and implanted plating and screws in order to treat a large central disk herniation. A subsequent MRI showed multilevel degenerative changes of the cervical spine including at C6-7, and Plaintiff reported continuing pain and tingling in both arms as well as her neck which led to an emergency room visit in August after she had been earlier treated with lidocaine injections. A subsequent EMG study showed abnormalities in both wrists indicative of bilateral carpal tunnel syndrome. In November of 2017, she was seen at Excelsior Orthopaedics for treatment of right shoulder pain. She also reported headaches as well as numbness, tingling, and weakness. She received an injection in her shoulder and her wrists in early 2018 underwent surgeries to repair a rotator cuff tear in the right shoulder and to address her carpal tunnel syndrome. She later reported little improvement in her shoulder but said that her carpal tunnel syndrome had gotten better. By November of 2018, she said that her quality of life and activities of everyday living had improved. An EMG study done that year showed the same abnormalities in the wrists as the 2017 study, however.

Beginning in 2016, Plaintiff also reported low back pain, evidenced at 2017 medical examinations by tenderness to palpation and increased pain with extension. A 2016 MRI of the lumbar spine had not shown any significant abnormalities other than some facet arthopathy at multiple levels, but a 2017 study showed loss of disc space and some disc bulges, particularly at L4-5 and L5-S1. Plaintiff was given lumbar facet injections in October and November of 2017 but she did not report any improvement in her symptoms. Also in 2017, mental health treatment notes from Horizon Corporations show that Plaintiff was mildly anxious but sleeping well with medication. However, notes from early 2018 indicate worsening depression with crying spells as well as high anxiety, which were followed by notes indicating she had no mental health

complaints and was looking forward to returning to work. By November of 2018, and into the following year, however, she reported significant stress from her relationship issues as well as increased anxiety, and she was often tearful during her counseling sessions.

Medical treatment notes from 2019 detail Plaintiff's various surgeries and indicate that she was having pain and tingling in her right hand and occasional numbness and tingling in her left hand, pain in her neck, pain in her right arm, and numbness and tingling in her left arm. She told her doctor that she could no longer tolerate her symptoms. She had also lost 85 pounds but her weight loss had not helped her conditions. Additionally, she had low back pain. An updated MRI showed an increase in the size of the disc herniation at C6-7. In June, 2019, she had a second neck surgery to address the disc herniation. She experienced significant pain post-operatively which was treated with medication.

### C.  The Opinion Evidence

Dr. Liu, a consultative examiner, performed an internal medicine examination on January 11, 2018. Plaintiff reported a history of arthritis and associated whole body pain which significantly limited her physical activity, as well as a history of anxiety and depression. She had difficulty with heel and toe walking due to low back pain and exhibited restricted range of motion in her neck and back. Her hand and finger dexterity was intact. Dr. Liu's diagnoses included arthritis, high blood pressure, anxiety, depression, and obesity. Dr. Liu concluded that Plaintiff had moderate limitations for lifting, carrying, and overhead reaching as well as mild to moderate limitations for prolonged walking and kneeling. (Tr. 357-60). A state agency physician, Dr. Poss, believed that Plaintiff could do a limited range of light work, including standing and walking for up to six hours in a workday, with most of her limitations stemming from her shoulder problems and carpal tunnel syndrome. (Tr. 66-69).

Also on January 11, 2018, Dr. Ransom, a psychologist, performed a consultative psychiatric examination. Plaintiff reported that she had been treated with medication over the past sixteen years due to bipolar disorder and anxiety. She was seeing a psychiatrist monthly and a counselor every two week, and her treatment was effective, although she had experienced a mild increase in her anxiety symptoms lately. Plaintiff demonstrated a full range of affect during the examination and her mood was neutral. Her attention, concentration, and memory were intact. Dr. Ransom diagnosed bipolar disorder and PTSD, both of which were stabilized with medication, and an unspecified anxiety disorder which was mild and episodic. Dr. Ransom did not think Plaintiff was impaired by her mental health disorders. (Tr. 365-68). Dr. Blackwell, a state agency psychologist, expressed an opinion on March 14, 2018, generally concurring with that conclusion. (Tr. 63).

### III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").
>
> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

## IV.  DISCUSSION

### A.  The Physical Residual Functional Capacity

As her first claim of error, Plaintiff argues that the ALJ erred when determining her physical residual functional capacity.  More specifically, she asserts that the ALJ should not have relied on the opinions of the consultative examiner, Dr. Liu, and the state agency reviewer, Dr. Poss, because both opinions had become stale by the time the ALJ made his determination, coming, as they did, before she had additional surgeries and before her condition worsened. Those additional surgeries included, as noted above, procedures on her left shoulder, both wrists, and cervical spine. She also points out that the medical records show a deterioration of the condition of her arms, hands, neck, back, and legs.  Accordingly, she claims that the ALJ was obligated to obtain an updated medical opinion and that because he failed to do so, his finding must have been based on his lay interpretation of the raw medical data, which is reversible error. The Commissioner, in turn, argues that none of the evidence which post-dates the opinions of Drs. Liu and Poss shows that Plaintiff's condition deteriorated, and that Plaintiff has failed to show how further development of the record would have altered the ALJ's decision.

The ALJ began his decision by finding that there were inconsistencies between Plaintiff's reported symptoms and the medical and other evidence of record.  He then reviewed the medical records, including the results of the consultative examination done by Dr. Liu and the findings

from office visits and clinical studies done in 2018 and 2019.  Turning to the opinion evidence, the ALJ credited the opinion of Dr. Poss, finding it persuasive because it was generally consistent with the record as a whole.  That record, as the ALJ interpreted it, showed that Plaintiff was "not in acute distress, had full strength, normal muscle tone, walked with normal steady gait and had a negative straight leg raising test." (Tr. 18).  She also had normal strength in her wrists and a full range of motion, and she saw the doctor only for regularly scheduled visits.  *Id*.  The ALJ also found Dr. Liu's opinion somewhat persuasive, albeit vague in some areas, but he concluded that the restrictions Dr. Liu had placed on lifting, carrying, reaching overhead, walking, and kneeling were all consistent with the medical evidence.  (Tr. 19).  The question posed by Plaintiff's first claim of error is whether the ALJ reasonably viewed the evidence as supportive of the opinions of Drs. Poss and Liu, or whether the evidence developed subsequent to their opinions undercut their views to the point where additional expert interpretation of the record was required.  *See, e.g., Vincent B. v. Comm'r of Soc. Sec.*, __ F.Supp.3d __, 2021 WL 4271926, at *3 (W.D.N.Y. Sept. 20, 2021), where this Court said,

> "Generally, an ALJ should not rely on 'stale' opinions—that is, opinions rendered before some significant development in the claimant's medical history ..., and medical source opinions that are stale and based on an incomplete medical record may not be substantial evidence to support an ALJ's finding." *Steve P. v. Comm'r of Soc. Sec.*, No. 19-CV-0492 MWP, 2021 WL 307566, at *5 (W.D.N.Y. Jan. 29, 2021) (internal citation, quotations, and alterations omitted). While a medical opinion may be stale "if it does not account for the claimant's deteriorating condition," it is not necessarily stale based on its age. *Biro v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 464, 470 (W.D.N.Y. 2018) (citation omitted). "In considering whether a medical opinion is stale, courts have frequently pointed to surgeries occurring subsequent to the medical opinion as evidence of the claimant's deteriorating condition." *Nagy v. Saul*, No. 19-CV-300-MJR, 2020 WL 3118569, at *5 (W.D.N.Y. June 12, 2020).

Here, Plaintiff had several surgeries after she was seen by Dr. Liu and after Dr. Poss reviewed the records. Their opinions are dated January 11, 2018 and March 27, 2018.  Plaintiff's right shoulder and right wrist surgery occurred on January 19, 2018; her left carpal tunnel release surgery happened on April 20, 2018; and in 2019 she underwent both bariatric surgery and a redo of her neck surgery.  All of these surgeries postdated Dr. Liu's examination, and all but one of them came after Dr. Poss's record review.  There are, of course, numerous medical records as well which show how her conditions progressed.  As the case law indicates, however, that fact alone does not mean that the two opinions were rendered stale.  The records have to be examined in some detail in order to answer that question.

As far as the shoulder and wrist surgeries are concerned, Dr. Poss had the benefit of the records of all but the left carpal tunnel release.  There is nothing in the record indicating that Plaintiff's wrist got worse after that surgery.  She did report some additional symptoms relating to her hands but they were viewed as resulting from her cervical spine disorder.  *See, e.g.,* Tr. 563.  However, an EMG done on October 31, 2018, did not show any cervical radiculopathy, and

it also indicated her wrist had not changed since 2017.  Overall, these records do not show the type of deterioration in the condition of her wrists or right shoulder that would call into question the opinions expressed by either Dr. Liu or Dr. Poss concerning the extent to which these impairments affected her functional capacity.

The neck surgery is a different matter.  It is fairly clear from the record that the initial surgery performed in 2017 did not successfully address Plaintiff's symptoms or functional impairments arising from her cervical spine disorder.  A treatment note from June 12, 2018 states that Plaintiff "thought having surgery would help and decrease her pain but it caused more pain...." (Tr. 530).  An earlier note reported that she was unable to function due to pain.  (Tr. 535).  On June 18, 2018, Plaintiff described a new symptom of intermittent burning pain radiating from her shoulders to her hands.  (Tr. 547).  She repeated the same or similar complaints on July 31, 2018 and August 9, 2018.  (Tr. 572, 561).  Throughout the following months she consistently reported increasing cervical pain and no improvement in her hands.  She also continued to be treated for low back pain which contributed to her lack of functionality.  A 2019 MRI of her lumbar spine showed an increase in the size of the disc herniation at C6-7 which led her surgeon to recommend a discectomy and fusion at that level, as well as removal of the hardware implanted in her prior neck surgery.  (Tr. 650).  That surgery took place on June 4, 2019, only months prior to the administrative hearing.  Two months after surgery, she was still reporting significant pain and was described at a medical appointment as being in "obvious discomfort" and as having had "very severe postoperative pain" with numbness throughout her arms.  (Tr. 923-4).  She also had limited range of motion of the cervical spine.  *Id*.

None of this information was available to either Dr. Poss or Dr. Liu.  Further, the only reasonable interpretation of this evidence is that Plaintiff's physical condition deteriorated after they rendered their opinions.  The ALJ's contrary view of this evidence does not comport with the record.  Under those circumstances, and applying the law as stated above, the Court concludes that the ALJ improperly relied on stale opinion evidence when he crafted the physical residual functional capacity.  Therefore, the case must be remanded for further consideration of this issue.

### B.  The Mental Residual Functional Capacity

Plaintiff's other claim relates to the ALJ's mental residual functional capacity determination.  Here, she asserts that the ALJ's error began when he rejected both functional capacity assessments in the record, one from Dr. Ransom, the consultative examiner, and the second from Dr. Blackwell, the state agency reviewer.  As noted above, neither of those sources identified any significant functional impairment arising out of Plaintiff's psychological diagnoses.  The ALJ found neither opinion persuasive, and he imposed a number of restrictions on Plaintiff's mental functional capacity, including limiting her to simple tasks performed in a relatively stable work environment which did not require more than occasional interaction with others.  Because there was no opinion evidence supporting such restrictions, Plaintiff argues that the ALJ must have based his conclusions on his own lay interpretation of the evidence.  The Commissioner does not directly address this argument, but contends more generally that the

opinion evidence, treatment notes, and Plaintiff's own description of her functionality all support the ALJ's finding.

The ALJ clearly rejected the opinion evidence by finding that Plaintiff had severe mental impairments and determining that they had more than a minimal impact on her functional capacity. In doing so, the ALJ was left with little besides raw medical data and lay evidence from which to craft his mental residual functional capacity finding. On remand - which, to be clear, is being ordered due to the error concerning Plaintiff's physical residual functional capacity - the ALJ should obtain additional evidence on this issue and be able to articulate, with reference to specific evidence, how he determines Plaintiff's mental residual functional capacity.

### V.  CONCLUSION AND ORDER

For the reasons set forth in this Opinion and Order, the Court **GRANTS** Plaintiff's motion for judgment on the pleadings (Doc. 11), **DENIES** the Commissioner's motion (Doc. 12), and **REMANDS** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

                                                **/s/ Terence P. Kemp**
                                                **United States Magistrate Judge**